**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 7 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

J.B., individually, and for her minor
child, L.B.,

      Plaintiffs-Appellants,

v.

WASHINGTON COUNTY,

      Defendant-Appellee.

No. 95-4197

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 93-C-1038G)

---

Matthew Hilton, Matthew Hilton, P.C., Participating Attorney for Rutherford
Institute, Inc., Springville, Utah, for Plaintiffs-Appellants.

Richard A. Van Wagoner, (with Allan L. Larson on the briefs), Snow, Christensen
& Martineau, Salt Lake City, Utah, for Defendant-Appellee.

---

Before KELLY, McWILLIAMS, and HENRY, Circuit Judges.

---

HENRY, Circuit Judge.

      In this 42 U.S.C. § 1983 action, plaintiff J.B., individually and for her

minor child L.B., alleges that defendant, Washington County, violated J.B.'s and

L.B.'s constitutional rights when County employees, acting under the authority of an *ex parte* order, seized L.B. for approximately eighteen hours. The purpose of this seizure was to obtain an interview with the child outside her parents' presence to investigate a report that the child's father had sexually abused her. Both parties submitted motions for summary judgment. The district court granted summary judgment to defendant Washington County, from which J.B. and L.B. now appeal. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

Washington County Deputy Pamela Humphreys was presented with a dilemma when she received an eyewitness report that a seven year-old child, L.B., had been sexually abused by her father. Recognizing the need in such cases for an interview with the child outside the presence of her parents, the County had adopted a policy to interview children alleged to be victims of child abuse at school.[1] In this case, however, the school interview procedure was not available

---

[1] See Utah Code Ann. § 62A-4a-101(16)(b) (1997) (protective services provided by the Division of Child and Family Services are in part to "substantiate evidence of neglect, abuse or exploitation"); Aplt's App. vol. II, doc. 5 at 8 (Depo. of Deputy County Attorney W. Brent Langston) ("If a child is going to school" it "would be normal" to conduct an interview at school to substantiate allegations of in-home child sexual abuse).

because L.B. was home-schooled. In accordance with the policies of the Sheriff's Office, Deputy Humphreys discussed the matter with County Sheriff Glenwood Humphries. See Aplts' App. vol II, doc. 4 at 4-6 (Depo. of Sheriff Glenwood Humphries).

Deputy Humphreys consulted a member of the Utah Division of Family Services,[2] Janalee Gregory, as required under Utah law. See Utah Code Ann. §§ 62A-4a-105(1), (6); -106(1)(h) (the Division [of Child and Family Services's] responsibilities include administering protective services to children); -101(16)(d)(i) (1996) (protective services defined as services provided "to bring the situation to the attention of the appropriate juvenile court and law enforcement agency" in cases of in-home perpetrators). Deputy Humphreys and Ms. Gregory could not think of a workable approach for conducting a private interview with L.B. See Aplts' App. vol. II, doc. 3 at 17-18 (Depo. of Deputy Sheriff Pamela Humphreys). Deputy Humphreys then sought advice from Deputy County Attorney W. Brent Langston, who is authorized by statute to prosecute any person charged with abuse or neglect before the juvenile court. See Utah Code Ann. § 17-18-(7)(c) (1995). Deputy County Attorney Langston concurred

---

[2]     In April 1996, the Utah legislature renamed the "Division of Family Services" the "Division of Child and Family Services." See Utah Code Ann. § 62A-4a-101 (1997) (Amendment Notes).

that an interview was necessary and suggested they consult Juvenile Court Judge Joseph Jackson.  See Aplt's App. vol. II, doc. 5 at 4, 11.

Judge Jackson recommended filing a petition with the juvenile court requesting an order to remove L.B. from her home temporarily to conduct an interview.  See id. doc. 3 at 31-33, and ex. 2 (Deputy Sheriff Humphreys's Supl. Report).  Deputy County Attorney Langston then prepared and filed a petition alleging "on information and belief" that L.B. was an "abused child."  See J.B. & L.B. v. Washington County, 905 F. Supp. 979, 983 (D. Utah 1995).  Following the *ex parte* hearing at which Deputy Humphreys testified, Judge Jackson issued an order to take L.B. to shelter care where she would stay pending a hearing.  See Aplts' App. vol. II, doc. 3 at 30-31.

Deputy Humphreys delivered the order to two uniformed police officers. The officers went to J.B.'s home in the early evening and took L.B. to a prearranged shelter home.  See id., doc. 7 at 7-8 (Depo. of Officer Kurt Wright). The next morning, Deputy Humphreys and Ms. Gregory interviewed L.B.  The interview revealed no evidence of sexual abuse and L.B. was released to her parents, seventeen and one-half hours after she was taken from her home.  See id. doc. 3, ex. 2; doc. 5 at 27-28.  Thereafter, the juvenile court case was dismissed on motion by the County Attorney's office stating there was insufficient evidence to believe that L.B. was an abused child.

4

**DISCUSSION**

Plaintiffs pursue four claims on appeal. First, they contend that the County's employees violated their rights to procedural due process when they removed L.B. from J.B.'s home. Second, they claim the removal of L.B. was a reckless and deliberate interference with familial associational rights. Third, they contend that the removal of L.B. violated their Fourth Amendment rights to be secure against unreasonable seizures. Finally, plaintiffs allege that the policy adopted by the County violated their Fourteenth Amendment right to equal protection.[3]

We review the grant of summary judgment de novo, applying the same standard as the district court. Hollingsworth v. Hill, 110 F.3d 733, 737 (10th Cir. 1997). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "We view the evidence and draw any inferences therefrom in the light most favorable to the party opposing summary judgment." Coosewoon v. Meridian Oil

---

[3] Plaintiffs do not appeal the district court's rulings on their claims brought under Utah state law.

5

Co., 25 F.3d 920, 929 (10th Cir. 1994). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." Thomas v. International Bus. Machs., 48 F.3d 478, 484 (10th Cir. 1995) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## I. County Policy or Procedure

The parties do not challenge the district court's holding that the actions of the officials involved are imputed to the defendant County as policy, procedure, or custom of the County because the actions were authorized or ratified by the authorized decision makers. See J.B., 905 F. Supp. at 985. The Supreme Court has recently calibrated the test for determining what comprises a county policy, in a failure to train setting, and we must evaluate its applicability here.[4] See Bryan County v. Brown, 117 S. Ct. 1382, 1391 (1997) (stating that "we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could

---

[4] Although plaintiffs at one time argued that a failure to train was involved, they have apparently abandoned that contention on appeal.

trigger municipal liability") (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 & n.10 (1989)).

A plaintiff seeking to impose liability on a county under § 1983 must identify a policy or custom that caused the plaintiff's injury. <u>Bryan County</u>, 117 S. Ct. at 1388. This "ensures that a [county] is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may be fairly said to be those of the [county]." <u>Id.</u> at 1387-88 ("municipalities and other local governmental bodies are 'persons' within the meaning of § 1983") (citing <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 689, 694 (1978)).

In addition to the identification of a county policy or custom, a "plaintiff must also demonstrate that, through its deliberate conduct, the [county] was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the [county] action was taken with the requisite degree of culpability and must demonstrate a causal link between the [county] action and the deprivation of federal rights." <u>Id.</u>

In <u>Pembauer v. Cincinnati</u>, 475 U.S. 469 (1986), the Supreme Court indicated that an authorized decision maker's course of action "tailored to a particular situation and not intended to control decision in later situations" may, under certain circumstances, give rise to liability under § 1983. <u>Id.</u> at 481.

7

"Where a 'plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show that the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued.'" Hollingsworth, 110 F.3d at 743 (quoting Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996) (citing Pembauer, 475 U.S. at 483-85)). Here, unlike the failure to train allegations in Bryan County, the decision to adopt the particular course of action to remove L.B. from her home to interview her outside the home was "made by [the county's] lawmakers or by those whose edicts or acts may be fairly said to represent official policy." Cannon v. City & County of Denver, 998 F.2d 867, 877 (10th Cir. 1993); see 905 F. Supp. at 985 n.7 (testimony of Washington County Sheriff Humphries stating that he approved Deputy Humphreys's actions "as being in accordance with [County Sheriff's Office's] policies and procedures").[5] Thus, the decision was a "course of action consciously chosen from among various alternatives," which generally implies a policy. Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).

---

[5] We have no doubt that the actions of Washington County Sheriff Humphries, an authorized policy maker of Washington County, bound the County in this case. See generally, Utah Code Ann. § 17-22-2 (Supp. 1996). Similarly, there is no question that the police officers who executed the removal order acted under the direction of Deputy County Attorney Langston and Sheriff Humphries. See Aplts' App. doc. 5 at 9; Utah Code Ann. § 17-18-1(1) (1995) (listing powers of county attorney).

8

Washington County's actions were tailored to accommodate its interest in investigating the sexual abuse allegations that involved a home-school child. This decision, properly made by the County's authorized decision makers, "surely represents an act of official government 'policy' as that term is commonly understood." Pembauer, 475 U.S. at 481.

We conclude the district court correctly found "that the actions taken by Deputy Sheriff Humphreys and Deputy County Attorney Langston constituted a 'policy, procedure or custom'" of Washington County. 905 F. Supp. at 985.

## II. Deprivation of Constitutional Rights

A. Procedural Due Process

Plaintiffs argue that the procedure that the County personnel employed to remove L.B. from her home did not comport with the constitutional requirements of procedural due process. They object to the *ex parte* discussion with Judge Jackson that took place before a court petition was filed. They also assert that the court documents did not explain why L.B. was being taken to shelter care, or provide information sufficient to permit them to prepare for a hearing. They also claim that the County's procedures to obtain an untainted interview with L.B.

9

were unsuccessful, because L.B.'s father spoke with her privately before she left for the shelter home.

To determine what process is constitutionally due, we look to three somewhat flexible demands of procedural due process:

> First, the private interest that will be affected by the official action; second the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976); see Morrissey v. Brewer, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

It is undisputed that J.B.'s liberty interests in the custody, care, and management of her children are of paramount importance. See Santosky v. Kramer, 455 U.S. 745, 760 (1981) ("[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of the natural relationship."). L.B. also enjoys a liberty interest requiring that procedural due process accompany her confinement. See Schall v. Martin, 467 U.S. 253, 263 (1984) (holding that juvenile pretrial detention implicates due process rights); Parham v. J.R., 442 U.S. 584, 600-01) (1979) (holding that a child has a "substantial liberty interest in not being confined unnecessarily for

10

medical treatment" under the Fourth Amendment). As the district court noted, "[t]he bonds of a unitary family are the foundation of society." 905 F. Supp. at 986.

We recognize that "[t]he forced separation of parent from child, even for a short time, represents a serious impingement" upon both the parents' and child's rights. Jordan v. Jackson, 15 F.3d 333, 346 (4th Cir. 1994). "Of course, the child also has obvious and compelling interests in his personal welfare and safety, which are opposed to those of his parents when they pose the threat to the child's safety." Id.

On the other side of the balancing equation lies the compelling interest of the government, acting as *parens patriae,* in protecting children from physical and sexual abuse. See Jordan, 15 F.3d at 346 (noting that "the "Commonwealth as *parens patriae* also has at stake compelling interests--those in the safety and welfare of its children"); Santosky, 455 U.S. at 766-67 (observing that "[t]wo state interests are at stake in parental rights termination proceedings--a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings"). The government also shares the interests of the parent and child in preserving their family's integrity. Santosky, (stating that "the *parens patriae* interest favors preservation, not severance, of natural familial bonds"). Without deciding which

11

of these two significant interests is weightier, we agree with the district court that "considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse." 905 F. Supp. at 986 (citing Jordan, 15 F.3d at 348).

Having recognized the importance of both the private and governmental interests, we turn to the last factor in the Mathews balancing, and examine the procedures used here, and the cost and benefit of additional procedures. In this case of first impression for Washington County officials, the officials had few options but to attempt an interview with L.B. outside of her parents' zone of influence.

"While there is always a risk of error when an emergency removal of a child from his parents' custody is required, the [County] has substantially reduced that risk at the threshold by the imposition of significant substantive limitations upon the removal authorization." Jordan, 15 F.3d at 346. It is undisputed that the County officials obtained a judicial order authorizing the temporary removal of L.B. from her home.

1. *Ex parte* communications

Plaintiffs object to the way County officials obtained the shelter care order, particularly to the officials' initial consultation with Juvenile Court Judge Joseph

12

Jackson. Judge Jackson's *ex parte* receipt of information before, rather than after, the time the County's agents filed the petition is not significant under these circumstances.

We recognize that *ex parte* communications may be fraught with peril, and that judges must take great care with respect to *ex parte* communications even in the most exigent of circumstances, but we can find nothing in the record to suggest that Judge Jackson abandoned the impartial judicial role. The factors that determine "whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Stump v. Sparkman, 435 U.S. 349, 362 (1978).

In this unique factual setting, the record indicates that rather than take action upon unsworn statements, Judge Jackson suggested the filing of a petition and the holding of a hearing--acts clearly within the jurisdiction invested in him. See Aplts' App. vol II, doc. 3 at 31, 33. By acting upon sworn statements and signed pleadings, Judge Jackson diminished the risks traditionally posed by *ex parte* communications. Absent any evidence that the Judge took improper action, we are reluctant to cast doubt upon the Judge's conduct, or to find that this procedure violated a constitutional right in any way.

13

## 2. Insufficiency of the court order

Although the court order did not inform plaintiffs of the reason L.B. was being taken to shelter care, the police officers who took her informed her parents that there had been a report of child abuse and there would be a hearing within 48 hours. A post-deprivation hearing was not held, however, because the child was released to her parents the following morning.[6] Therefore, plaintiffs' claim that they might not have been able to prepare for a hearing because of the scant order is too speculative for our review. Cf. Whitemore v. Arkansas, 495 U.S. 149, 160-61 (1990) (holding that speculative theory of possible injury insufficient to establish injury in fact under Article III's case or controversy requirement).

## 3. Reliability of the interview

Although the risk of erroneous deprivation for seventeen and one-half hours existed, we agree with the district court that the reliability of an out-of-

---

[6] The then-relevant statute, Utah Code. Ann. § 78-3a-306(4)(a) (1994) (amended 1995), provided for a mandatory post-deprivation hearing following an emergency removal of a child which lasted 48 hours or more to determine the validity of continuing state custody of the child. The detention here lasted less than 18 hours, therefore no hearing was required.

The very existence of this statute indicates the attempt by the Utah legislature to provide safeguards in this kind of case. "States across the country have struck the same or similar balance when confronted with the . . . question [of how to balance private and public interests with the requirements of procedural due process]." Jordan, 15 F.3d at 351 and nn. 17-19 (citing state statutes involving emergency removal of a child that provide for an interim period before a post-deprivation hearing must be held).

14

home interview to investigate the eyewitness sexual abuse allegations is of overriding importance, and the risks of a tainted interview in the home or the returning a child to an abusive situation are enormous. See 905 F. Supp. at 987.

Plaintiffs claim that the adopted procedure was not completely free of parental influence because L.B.'s father was able to speak privately with L.B. before the interview. The alternative approach submitted by plaintiffs, however (asking L.B.'s parents to permit a private interview to take place in the home), appears even more infeasible and uncertain. J.B.'s testimony reflects that parental permission for a private interview within L.B.'s home was uncertain, and in any event the point of removal of the child from the home was to conduct the interview in an influence-free environment. Plaintiff J.B. also admits that had the officers simply asked to interview L.B., that she "wouldn't say yes." Aplts' App. vol. I, doc. 6 at 37 (Depo. of J.B.). This only belies plaintiffs' claim that the officials should have requested parental consent to an at-home interview.

In retrospect, Washington County employees could have, as the district court noted, chosen an alternative route, "such as conducting the interview in the shelter care center sooner and without requiring overnight detention." 905 F. Supp. at 987 n.13. Given the extraordinary situation facing them, we conclude that the procedures employed were reasonably calculated to balance the competing interests and to achieve an interview with the child untainted by either

15

parent's influence. See Hollingsworth, 110 F.3d at 739 ("Removal of children from the custody of their  parents requires predeprivation notice and a hearing 'except for extraordinary situations where some valid governmental interest is a stake that justifies postponing the hearing until after the event.'") (quoting Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989) (internal quotations omitted)).  Cf. Doe v. Hennepin County, 858 F.2d 1325, 1326-29 (8th Cir. 1988) (holding no constitutional violation occurred where children removed from home after reports of sexual abuse, post-deprivation hearings were held the following day, and children were subsequently kept from home for 16 days and returned to home after reports of abuse proved unfounded).  Accordingly, we agree with the district court that the Washington County officials' actions did not violate plaintiffs' procedural due process rights.

B. Substantive Due Process

Plaintiffs' right of familial association is included in the substantive due process right of freedom of intimate association, which is "consonant with the right of privacy." Griffin v. Strong, 983 F.2d 1544, 1547 (10th Cir. 1993).  The right is based on the Fourteenth Amendment liberty interest. See id.  Evaluation of a party's Fourteenth Amendment substantive due process rights requires a "balancing [of the party's] liberty interests against the relevant state interests."

16

Youngberg v. Romero, 457 U.S. 307, 321 (1982). Accordingly, we must weigh plaintiffs' rights of familial association against Washington County's interest in protecting children within its jurisdiction from sexual abuse.

Undeniably, plaintiffs have a substantial interest in the right to associate with their family. "Family relationships 'by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctly personal aspects of one's life.'" Arnold v. Board of Educ. of Escambia County, 880 F.2d 305, 312-13 (11th Cir. 1989) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984)).

As to Washington County's interest, the Supreme Court has noted that governmental entities have a "traditional and 'transcendent interest'" in protecting children within the county from abuse. Maryland v. Craig, 497 U.S. 836, 855 (1990) (citing Ginsberg v. New York, 390 U.S. 629, 640 (1968)). Accord New York v. Ferber, 458 U.S. 747, 757 (1982) (stating "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance"). As the district court aptly observed, the "[i]nvestigation of child abuse allegations 'deserves no less attention'" than the protection of children from abuse. 905 F. Supp. at 988 (quoting Griffin, 983 F.2d at 1548).

17

In evaluating these competing interests, we have observed that "[n]ot every statement or act that *results* in an interference with the rights of intimate association is actionable." Griffin, 983 F.2d at 1548. The conduct or statement must be directed "at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." Id.

Here, plaintiffs have sounded a constitutional claim by alleging that the conduct of the County officials was directed at the family relationship with knowledge that it would adversely affect that relationship. "[I]t is evident that there was interference with plaintiffs' rights of familial association" because "L.B. was physically removed from her home and from her parents for a period of almost 18 hours," which "included an overnight stay in a pre-arranged shelter home." 905 F. Supp. at 988. Therefore, we proceed to "examine the evidence to determine the severity of the alleged infringement, the need for the defendant's conduct, and any possible alternatives." Griffin, 983 F.2d at 1548.

Plaintiffs recognize that the County officials had a duty to investigate the report of child sexual abuse. They do not allege that the officials were motivated by any other purpose apart from investigation. Rather, they claim that the officials failed to use the least disruptive procedure to interview the child.

We agree with the district court that while the County's "objectives might have been accomplished within a shorter period, there is no evidence that [the

County officials] intended or directed their conduct in this matter at the familial relationship of L.B. and J.B. with knowledge that such conduct would adversely affect the relationship as required by [this court]." 905 F. Supp. at 988 (citing Griffin, 983 F.2d at 1546, 1548). "Absent such evidence of wilfulness or intent," the district court appropriately determined that no genuine issue of material fact exists as to plaintiffs' substantive due process claims. Id. We similarly conclude that the County officials' conduct did not impermissibly interfere with plaintiffs' right of familial association.

### III. Fourth Amendment Violations

Plaintiffs claim that L.B.'s court-ordered removal from her home to a shelter home for the purposes of investigating allegations of sexual abuse violated their Fourth Amendment rights. Plaintiffs assert that (1) plaintiff J.B. has standing under the Fourth Amendment; (2) the order issued by Judge Jackson was not supported by probable cause; (3) Judge Jackson did not act as a neutral and detached magistrate; (4) the order was not specific as to the location where L.B. could be seized; and (5) the execution of the order was unreasonable. We affirm the district court's grant of summary judgment against plaintiffs on these claims. We address each contention in turn.

A.    Standing

It is well established that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969).  The gravamen of plaintiffs' Fourth Amendment claim in this case is the court-ordered seizure of L.B.  The district court was correct in ruling that plaintiff mother, J.B., may not assert a derivative or vicarious claim based on L.B.'s Fourth Amendment injuries. But the court below did not focus on the separate claim of J.B., alleging her own distinct injuries as a result of the seizure of her seven-year-old daughter.  While it is clear that constitutional protection afforded a parent against a child's seizure in these circumstances may be found in the Fourteenth Amendment, Curnow ex rel. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991) (holding that "a parent who claims loss of the companionship . . . of his or her child" raises a claim based on the Fourteenth, not Fourth Amendment); Griffin, 983 F.2d at 1547 (holding that familial right of association is found in Fourteenth Amendment), there may be circumstances in which a parent has Fourth Amendment standing to challenge a seizure involving a minor child. See 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 9.2 at 732-33 and nn. 26-28 (1984) (noting that the Model Code of Pre-Arraignment Procedure "provides that a defendant has

20

standing with respect to searches of or seizures from various persons with whom the defendant has" a spousal, parental, or sibling relationship where a "common zone of privacy" was intruded upon). Cf. Hollingsworth, 110 F.3d at 739 (limiting representative standing to parents where child included as plaintiff). But see Tenebaum v. Williams, 862 F. Supp. 962, 973 (E.D.N.Y. 1994) (noting that "the Court is not aware . . . of any federal decision which has held that a parent may legitimately assert an individual, as distinct from representative, Fourth Amendment claim based upon the seizure of a child"). Neither the cases cited by the parties nor those found by the court precisely address the issue. However we need not reach the question because J.B. does have standing under the Fourteenth Amendment to assert a claim that would, if she were successful, result in full compensation for any harm suffered.

The district court was also correct in holding that the County officials' temporary removal of L.B. from her home is a seizure which implicates L.B.'s own Fourth Amendment rights. See Van Emrick v. Chemung County Dep't of Social Servs., 911 F.2d 863, 867 (2d Cir. 1990) (noting that "when the procedures undertaken at the initiative of a state official serve primarily an investigative function . . . Fourth Amendment and bodily integrity interests of the child are implicated"). We conclude that L.B. does have standing to challenge her removal from her home. Therefore, we must determine whether the seizure in this case is

21

consistent with the limitations on governmental authority contained in the Fourth Amendment.

B. Probable Cause

Plaintiffs argue that the temporary removal of L.B. from her home for questioning by the authorities violated the Fourth Amendment because the agents of Washington County lacked probable cause to believe that L.B. had been abused. Specifically, plaintiffs complain that the principal source of information supporting probable cause, the informant's statement to Deputy Humphreys, contained inaccurate information, and that Deputy Humphreys inadequately investigated the informant's claims.[7]

A threshold question is the proper standard for evaluating the constitutionality of the seizure. The Supreme Court has yet to decide whether the temporary removal of children in cases of suspected abuse or neglect is governed by the probable cause standard. It could be argued that such removal is based on "'special needs, beyond the normal need for law enforcement,'" O'Connor v.

---

[7] For example, plaintiffs argue that the informant erroneously claimed that J.B. and L.B. were on vacation at the time the allegation was made and that the father did not have employment outside the home. See Aplts' App. vol. II, doc. 3 ex. 1 at 2 (incident report).

Ortega, 480 U.S. 709, 720 (1987) (quoting New Jersey v. T.L.O., 469 U.S. 325, 351 (1985)), and therefore permissible in the absence of probable cause. See e.g., Vernonia Sch. Dist. 47J v. Acton,115 S. Ct. 2386, 2396-97 (1995) (upholding scheme of suspicionless drug testing of student-athletes under special needs doctrine); T.L.O., 469 U.S. at 347-348 (permitting warrantless search of student's purse grounded in reasonable suspicion of presence of cigarettes; state's interest in maintaining discipline in schools provides special need beyond criminal law enforcement obviating need for probable cause).

Though the district court at one point suggested that a standard less than traditional probable cause might be proper in evaluating the seizure in this case, see 905 F. Supp. at 990 n.15 ("This ruling is directed only at the facts of this case. In other cases, the duty of government officials to investigate the veracity of an anonymous informant might be more feasible, and a higher degree of probable cause would be required."), the district court actually invoked the traditional probable cause formulation of Illinois v. Gates, 462 U.S. 213, 238 (1983) (emphasizing that the judge must make a "practical, common-sense decision whether, given all the circumstances . . . . there is a fair probability" that the facts to which the probable cause determination is addressed exist). The district court also cited approvingly to Tenebaum, 862 F. Supp. at 975-76, which applied the traditional probable cause standard in circumstances similar to those

23

here.  Moreover, it did not anywhere state that a lesser quantum of suspicion of wrongdoing, such as the reasonable suspicion standard, would suffice to justify this seizure.  Thus, the record in this case supports the view that the district court found probable cause for the seizure of L.B.

Before discussing the record, two preliminary observations are in order. First, probable cause "is a fluid concept--turning on the assessment of probabilities in particular factual contexts," Gates, 462 U.S. at 232, and the value of informants' tips in establishing probable cause is as varied as the myriad of fact situations in which they arise.  Nevertheless, courts traditionally have distinguished between anonymous tipsters, whose motives and bases of knowledge are unknown to the investigating officers, and ordinary citizens who identify themselves and report crimes to the police.  Although the courts have eschewed rigid rules, the probable cause case law emphasizes the importance of corroboration of some amount of the anonymous tipster's information in establishing probable cause,  see e.g., United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997) (discussing necessary corroboration of anonymous tip to establish reasonable suspicion); United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir. 1996) (discussing corroboration necessary to support search warrant based on anonymous tip); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995) (same), while presuming the reliability of citizen informants.  See e.g., United

States v. Decoteau, 932 F.2d 1205, 1207 (7th Cir. 1991) (suggesting that probable cause exists when an officer receives information from an ordinary citizen who claims to have witnessed a crime, and whom the officer reasonably believes is telling the truth).

Second, appellate courts reviewing probable cause determinations owe substantial deference to the judicial officer making the initial probable cause determination. See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996) (citing United States v. Williams, 45 F.3d 1481, 1485 (10th Cir. 1995)). As the Supreme Court explained, the job of the appellate court "is to ensure that the magistrate had a 'substantial basis for . . . conclud[ing] that probable cause existed.'" Gates, 462 U.S. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

In the typical probable cause review case, a magistrate has made a finding of probable cause to issue a warrant (either for search or arrest). The situation in this case is analogous. Deputy Humphrey's petition to the juvenile court was, for our purposes, tantamount to an application for an arrest warrant, while Judge Jackson's order to take L.B. to a shelter home was tantamount to an arrest warrant issued by a magistrate. In evaluating the reasonableness of this seizure, under Fourth Amendment principles, we owe the same deference to Judge Jackson's determination supporting the removal order that we would owe to a magistrate's

25

finding of probable cause in issuing a warrant. See e.g., Cusumano, 83 F.3d at 1250 (noting that "we give 'great deference' to the decision of the issuing magistrate" in determining whether probable cause supported the issuance of a search warrant) (quoting Williams, 45 F.3d at 1485).

Under the totality of the circumstances, see Gates, 462 U.S. at 230, we agree with the district court that there was probable cause to temporarily remove L.B. from her home for questioning. The informant, whose identity was known to Deputy Humphreys, see Aplt's App. doc. 3 at 8, gave an eyewitness account of the alleged sexual abuse. Judge Jackson questioned the investigating officer regarding the statements of the informant, prior to entering the removal order. Id. at 983. Under these circumstances, we hold that Judge Jackson was entitled to conclude that there was probable cause to temporarily remove L.B. from the home for questioning.

Plaintiffs miss the mark in arguing that certain information provided by the eyewitness was incorrect, and that Deputy Humphreys failed to corroborate the informant's statements. The incorrect information was immaterial to the allegations of sexual abuse. Because Deputy Humphreys knew the eyewitness's identity, and thus was able to assess that person's veracity, corroboration was unnecessary in this case. See Decoteau, 932 F.2d at 1207 (considering an identified informant's tip, the court noted that "if it seems reasonable to the

police to believe that the [ordinary citizen] eyewitness was telling the truth, they need not take any additional steps to corroborate the information regarding the crime before taking action").

C. Neutral and Detached Magistrate

Similarly, plaintiffs cannot prevail on the basis of their argument that Judge Jackson's order was invalid because he was not a neutral arbiter of probable cause, but an active participant in the investigative process. The Fourth Amendment may be violated when the judge abandons the judicial role and acts as "'an adjunct law enforcement officer.'" See United States v. Leon, 468 U.S. 897, 914 (1984) (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27 (1979)). However, we agree with the district court's conclusion that the circumstances of this case do not warrant the conclusion that Judge Jackson lacked the neutrality or detachment required by the Fourth Amendment. While plaintiffs contend that it was improper for Judge Jackson to discuss the case *ex parte* with Deputy County Attorney Langston and Deputy Humphreys before the petition was filed, they do not allege that Judge Jackson commandeered a law enforcement role. There is nothing in the record that suggests that Judge Jackson overstepped his judicial

27

capacity. These circumstances do not call into question Judge Jackson's neutrality or detachment.

D. Insufficient Specificity of the Ex Parte Order

Plaintiffs also allege that the order was constitutionally infirm because it did not describe the location from which L.B. was to be seized. They argue that the order permitted the County's agents to seize L.B. wherever they may have found her, even without her parents' knowledge. The particularity requirement for a seizure warrant must specify the "persons or things to be seized." U.S. Const. amend IV. Plaintiffs misread the particularity requirement for a search warrant, which requires a description of "the place to be searched," id., to extend to a seizure. However, there is no requirement that a seizure warrant describe with particularity the location of the person to be seized.

E. Execution of Order

Plaintiffs final objection to the shelter care order is the manner in which it was executed. They maintain that the execution of the order was unreasonable because it was executed late in the day so that L.B. was required to stay in shelter

28

care overnight, the officers did not provide the parents with much information, and a less intrusive method could have been used to obtain the interview.

As noted earlier in this opinion, we agree with the district court that although "different procedures may have been taken that would have been less intrusive, such as conducting the interview in the shelter care center sooner and without requiring overnight detention," the procedures adopted by the County "constitute[d] a permissible balancing of the substantial private and public issues at stake." J.B., 905 F. Supp. at 987 n.13. Because the analysis under procedural due process applies to plaintiffs' arguments in the Fourth Amendment context, we also reject plaintiffs' claims here.

## IV. Equal Protection

Plaintiffs final claim is that their Fourteenth Amendment rights to equal protection of the laws were abridged by the County's removal of L.B. from her home. They claim that L.B. is a member of a "suspect class" of children whose parents choose to school them at home. They maintain that the County treated L.B. differently than children not schooled at home. Plaintiffs further raise a substantive due process claim that J.B. was exercising her fundamental right to school her child at home, and the County's policies impermissibly interfered with

29

that right.  Lastly, plaintiffs allege that they were penalized for exercising their fundamental right to school L.B. at home.

"[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).  "While home school families impelled by deep-seated religious convictions might be the type of 'discrete and insular minorit[y]' to which Justice Stone referred in footnote four of United States v. Carolene Products Co., 304 U.S. 144 (1938), the broad secular category of individuals who prefer to school their children at home is not."  Murphy v. Arkansas, 852 F.2d 1039, 1043 (8th Cir. 1988).

Plaintiffs do not assert that the County's adopted policy is aimed at Murphy's first category of individuals.  Because the policy undeniably affects the "broad secular category of individuals" who home-school their children, we examine whether the County officials' actions rationally furthered a legitimate state interest.  As stated above, the County had an important interest in investigating the report of child abuse, and the means used to effect a private interview with L.B. rationally furthered that interest and were not unduly intrusive under these circumstances.

30

Plaintiff J.B. also contends that the County interfered with her fundamental right to direct the upbringing and education of her child. See e.g. Wisconsin v. Yoder, 406 U.S. 205, 213 (1972). Although the exercise of this right "may be fairly characterized as [an] exercise[] of familial rights and responsibilities . . . [parents] have no constitutional right to provide their children with private school education unfettered by reasonable government regulation." Runyon v. McCrary, 427 U.S. 160, 178 (1976).

The conduct of the County officials did not impede the exercise of J.B.'s right to home-school L.B. As the district court noted, "[i]nstead, [the County] employees merely chose a different method of dealing with the child abuse allegation as a result of [p]laintiffs' different circumstances." 905 F. Supp. at 991. We agree with the district court that "[t]he classifications in this case, and the conduct of defendant's employees based thereon, do not violate the Equal Protection Clause." Id.

## CONCLUSION

This is a difficult case, pitting the fundamental rights of parents and families--rights that are in Griffin's terms, "consonant with the right of privacy"-- against the awesome responsibilities of a county to investigate child abuse, a most

31

reprehensible and ever-increasing problem. 983 F.2d at 1547. Though it is possible, with hindsight, to suggest improvements in the procedures utilized by Washington County, in our judgment, the County's good faith efforts did not result in a violation of the plaintiffs' constitutional rights.

Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.