UNITED STATES of America,
Plaintiff–Appellee,

v.

Dale D. DECOTEAU,
Defendant–Appellant.

No. 89–3648.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1990.

Decided May 28, 1991.

Byron G. Cudmore and Rodger A. Heaton, Asst. U.S. Attys., Office of the U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Stanley N. Wasser, Feldman & Wasser, Springfield, Ill., for defendant-appellant.

Before FLAUM, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The events which gave rise to Dale Decoteau's twenty-year sentence for firearm possession took place in Meredosia, a village of some 1200 inhabitants in downstate

Illinois. While riding as a passenger with Decoteau, a woman observed a sawed-off shotgun slide out from under the seat of the car. Decoteau told her that the gun was to be used to "off" any police officers who might happen to pull him over. The following day the chief of police of Meredosia received a call from the woman, who was an acquaintance of his. The woman related her observation regarding the sawed-off shotgun and identified Decoteau by name. She also told the chief that she had seen some papers regarding Decoteau's release from prison. In addition, she gave the chief Decoteau's physical description and birth date. She also told the chief that Decoteau would be in Meredosia at the Dosh Delite restaurant at 2:00 p.m. the next day.

After speaking with the witness, the chief contacted detectives at the Morgan County Sheriff's Department. The detectives ran a criminal history check on Decoteau, which disclosed a prior arrest record. The chief and the detectives agreed that the chief should meet with the witness to confirm some of the details mentioned in the phone call. That evening, the chief met with her and she repeated the information she had given on the phone. Also, during the meeting she pointed out to the chief the green Dodge station wagon in which Decoteau had given her a ride.

The next day, the chief called the witness and confirmed that Decoteau was on his way to Meredosia and that he had the guns with him. The chief and the sheriff's detectives set up surveillance of the Dosh Delite restaurant. At 2:00 p.m., the chief observed the green Dodge station wagon in front of the Dosh Delite. A woman got out and the car drove away. The driver of the Dodge station wagon met the description of Decoteau given by the witness.

The sheriff's detectives then followed the station wagon in an unmarked police car. The chief radioed the sheriff's detectives and told them that the vehicle under surveillance was displaying license registration in a manner which violated Illinois law. The station wagon continued down the street through town, and then turned

around and came back. The sheriff's detectives corroborated the descriptions of the defendant and the car. When the detectives displayed a red light and activated the siren, both officers observed the defendant make a "furtive" movement to the right. The officer on the passenger side of the police car told the driver to be careful, because the driver of the station wagon might be going for his gun. The green station wagon pulled over and the driver was ordered out of his vehicle. An immediate search of the vehicle produced the sawed-off shotgun, a .357 handgun, and some .410 gauge shotgun shells.

The foregoing factual scenario was initially elicited at a pretrial suppression hearing from the police officers involved in Decoteau's apprehension. Decoteau sought to suppress the evidence seized in the warrantless search of the station wagon. The district court found: that based on the totality of the circumstances, the police had probable cause to believe that Decoteau was committing an offense and possessed evidence of a crime; that the police took steps reasonably prudent to corroborate the details provided in the tip; and that the citizen informant was reliable. The district court denied Decoteau's motion to suppress the evidence obtained in the search and the evidence was introduced by the government at trial.

Decoteau was convicted of two counts of felony in possession of a firearm and one count of possession of an unregistered firearm. At sentencing, Decoteau moved to prohibit the government from seeking enhanced penalties under 18 U.S.C. § 924(e)(1), because he claimed he did not have three prior convictions, as required by the statute. Decoteau argued that in one of his prior convictions, his civil rights were restored by the state, and thus it was not a "conviction" as defined in 18 U.S.C. § 921(a)(20).

■ The first issue for us to decide is whether the police had probable cause to stop Decoteau and search his vehicle. Under the Fourth Amendment, the police must have had probable cause to believe that the automobile being stopped and

seized contained an illegally possessed sawed-off shotgun for the warrantless search to be permissible. *United States v. Marin,* 761 F.2d 426, 430 (7th Cir.1985) (citing *Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925)). The district court is to look at the totality of the circumstances in determining whether probable cause existed. *Id.* at 431 (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). We start our analysis by noting that the informant did not simply provide information of suspicious conduct to the police. She actually witnessed a crime being committed. Under Illinois law, it is a felony to possess a sawed-off shotgun. Ill.Rev.Stat. ch. 38, ¶ 24–1(a)(7). The witness observed the defendant in possession of the sawed-off shotgun the previous day. Therefore, for the purpose of determining the existence of probable cause, it is not relevant whether the police also established that Decoteau was a convicted felon or that the firearm was unregistered. As it turned out, Decoteau was a convicted felon and the sawed-off shotgun was later determined to be unregistered. Thus, Decoteau's possession of the shotgun was in violation of federal law as well.* But at the time of the stop it was sufficient that the police had eyewitness information on which to base a probable cause determination as to a violation of Illinois law.

■ The proper focus—when a citizen witnesses a crime and notifies the police—is whether the information related to the police must be corroborated by them before they have probable cause to stop a suspect and search his automobile. The issue was addressed in *Gramenos v. Jewel Cos.,* 797 F.2d 432 (7th Cir.1986), *cert. denied,* 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987). In that case, we held that "[w]hen an officer has 'received his information from some person—normally the putative

victim or an eye witness—who it seems reasonable to believe is telling the truth' ... he has probable cause." *Id.* at 439 (citation omitted). Thus, if it seems reasonable to the police to believe that the eyewitness was telling the truth, they need not take any additional steps to corroborate the information regarding the crime before taking action.

■ We noted in *Gramenos,* however, that the police must treat reports of crimes with some caution. *Id.* This would seem particularly true of victimless or status crimes such as the one we have here. But in this case the chief had known the eyewitness for approximately six months. She was not describing a crime from long ago. She was not confused or inconsistent in her recitation of the events. She gave specific and detailed information, then met with the chief to repeat the information and to show him the vehicle involved. There was no reason for the officers to suspect that she was not being truthful. Here, the citizen informant's observation of the crime provided probable cause for the subsequent search and seizure by the police.

The second issue is whether the district court erred in not applying the rule of lenity in interpreting how the restoration of civil rights following release affected the application of enhanced penalties under 18 U.S.C. § 924(e)(1). We begin our analysis with our recent decision in *United States v. Erwin,* 902 F.2d 510 (7th Cir.), *cert. denied,* ── U.S. ──, 111 S.Ct. 161, 112 L.Ed.2d 127 (1990).

■ In *Erwin,* we held that a defendant whose "civil rights" are automatically restored at the end of his sentence nonetheless is considered "convicted" for purposes of § 921(a)(20) under Illinois law. The defendant was thus exposed to the special punishment in §§ 922(g) and 924(e).

---

* While under federal law a sawed-off shotgun must be unregistered for mere possession to be a felony (implying that the sawed-off shotgun may be registered), 26 U.S.C. § 5861(d), other courts have found that, because of the very nature of the object and the fact that so few sawed-off shotguns are actually registered, just witnessing someone in possession of such a

weapon provides probable cause that the firearm is unregistered. *United States v. Melvin,* 596 F.2d 492, 500–01 (1st Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *United States v. Story,* 463 F.2d 326, 328 (8th Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972).

We noted that the second sentence of § 921(a)(20) "does not require a federal court to disregard the state's definition of a conviction just because the state has restored any one civil right." *Erwin*, 902 F.2d at 512. We must decide whether under North Dakota law the restoration of "civil rights" upon completion of sentence means that Decoteau is no longer "convicted" for purposes of these federal laws.

North Dakota law determines the meaning of "conviction" under the first sentence of § 921(a)(20). *Id.* Section 12.1–33–02 of the North Dakota Century Code provides:

> Except as otherwise provided by law, a person convicted of a crime does not suffer civil death or corruption of blood or sustain loss of civil rights or forfeiture of estate or property, but retains all of his rights, political, personal, civil, and otherwise, including the right to hold public office or employment; to vote; to hold, receive, and transfer property; to enter into contracts; to sue and be sued; and to hold offices of private trust in accordance with the law.

In the judgment of conviction and commitment of Decoteau handed down by the North Dakota state court, the court ordered that pursuant to North Dakota statute, Decoteau's rights to vote and to hold future public office would be lost for the period of actual incarceration, and that he would suffer no other disability by virtue of his conviction and sentence except as otherwise provided in the sentence or provided by law. Finally, § 62.1–02–01 of the North Dakota Century Code provides that a person convicted of a felony is prohibited from owning or possessing a firearm for a period of either five or ten years, depending on the type of felony.

We found in *Erwin* that the second sentence of § 921(a)(20) was "an anti-mouse-trapping rule." "If the state sends the felon a piece of paper implying that he is no longer 'convicted' and that *all* civil rights have been restored, a reservation in a corner of the state's penal code can not be the basis of a federal prosecution." *Erwin*, 902 F.2d at 512–13. But "[w]hen [ ] the state sends no document granting pardon or restoring rights, there is no potential for deception, and the question becomes whether the particular civil right to carry guns has been restored by law." *Id.* at 513. Decoteau's civil rights were restored by operation of statute. There was no potential for deception here. North Dakota law does not allow Decoteau to possess guns, so Decoteau stands convicted of a crime for purposes of § 921(a)(20).

■ We must address one final issue raised by Decoteau. Some of the findings of the district court made in denying the motion to suppress were taken from proposed findings drafted and submitted to the court by the United States Attorney's office at the request of the district judge. This procedure was noted by the court to be a "current practice" in the district. Decoteau questions whether it was proper for the district court to rule on the motion to suppress and then to request that the government draft proposed findings to support his ruling. While we find no error in this case, we think the better approach in the criminal context is for the district court to independently prepare the findings of fact. We have no doubt that the district judge properly carried out his role as a neutral judicial decision maker—but the exercise of this neutral role should be clearly perceived even by those less sophisticated in the workings of the judicial process. The government's involvement in drafting proposed findings for the court in a ruling adverse to the defendant obscures the reality of fairness of the judicial decision.

For the foregoing reasons, the conviction and sentence of Dale Decoteau are AFFIRMED.