NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 20, 2017
Decided August 16, 2017

**Before**

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

SHARON JOHNSON COLEMAN, *District Judge*[*]

No. 16-3047

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 3:15-cr-00132-jdp-1 |
| RICHARD GEASLAND, *Defendant-Appellant.* | James D. Peterson, *Chief Judge.* |

**O R D E R**

Richard Geasland pleaded guilty to possessing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), and was ordered to serve a prison term of 120 months. Geasland appeals the denial of his motion to suppress evidence seized in the search of his apartment as well as the district court's determination that a prior Wisconsin conviction for sexual assault of a minor qualifies as a conviction under a state law relating to abusive sexual contact with a minor so as to trigger a ten-year mandatory minimum term of imprisonment, *see* 18 U.S.C. § 2252(b)(2). We affirm the judgment.

---

[*] Of the Northern District of Illinois, sitting by designation.

## I.

On the morning of October 6, 2015, Susan Leppert presented herself at the Cuba City, Wisconsin police department to make a report concerning her former neighbor, Richard Geasland. For the prior month and a half, Leppert had been living in the first-floor apartment of a two-flat residence at 317 South Main Street; Geasland lived in the upstairs apartment. Geasland and Leppert were on friendly terms. But two days earlier, Leppert had had a disturbing conversation with Geasland that had caused her to move out of the apartment and ultimately had brought her to the police station. Chief of Police Terry Terpstra interviewed Leppert and had her prepare a handwritten statement detailing what she told him. Leppert wrote out a three-page statement on a "Voluntary Statement" form provided to her. The first page of the form contained a pre-printed certification stating: "I am making this statement to the Cuba City Police Department. I have read, or have had read to me, this statement, each page of which bears my signature. … I certify that the facts and details contained herein are true and correct." R. 18-2 at 4. Below that certification, Leppert filled in her identifying information and signed the form. Next to that, Terpstra likewise provided his identifying information and signed as a witness.

As the content of Leppert's statement is relevant to the validity of the warrant authorizing a search of Geasland's apartment, we recount it in full below. We have broken the statement into paragraphs for ease of reading. The statement read as follows:

On 10/4/15 Richard Geasland welcomed me into his apartment for a tour. Before I entered his living room, he turned off his computer monitor and said he had some pictures on his computer he didn't want me to see. He asked me to sit down, offered me a pop, and said he wanted to explain why he was in prison.

> He asked me if I knew what a pedifile [sic: pedophile] or hedofile [sic: hebephile] is. I said I only know what a [pedophile] is. He said [pedophile] is if you like people/kids underage & [hebephile] is someone who likes older people. He said he went to prison for touching a 5-year old girl. He said it was his girlfriend's niece, who was 5 years old & she used to stay at their house on the weekends. He said him & her both went to prison for touching the little girl. He said cuddling was always more than cuddling. He said when they picked her up she kissed him on the cheek & when he went to kiss her on the cheek, she turned her head & kissed him on the lips & stuck her tongue in his mouth. He said she would lay in bed & cuddle with him. He said he went to prison for her giving him oral sex. He tried to justify it by saying, he felt like she knew what she was doing & felt as if she had done it before because she knew how to bob her head. He

said she lived with her mom & 3 [M]exican guys & one of them was the mom's boyfriend. He said he thought the mom's boyfriend made her do these sexual things because she seemed "experienced."

He said he also did sexual things with his daughter and that she has not talked to him in 15 years because of what he did. [H]e said she moved to [F]lorida & that he doesn't have a relationship with her because of what he made her do. He said he was mad at her for telling his son because they no longer have a good relationship. He said he spends holidays alone because they won't forgive him.

He said him & his girlfriend went to prison for what they did to the 5 yr old.

He told me the reason he turned off the computer monitor [was] because he had pictures of naked children on his computer & didn't want me to judge him before he explained his past. He said he sits on his computer all night looking at young girls/children on a porn site online. He said it is a private network where naked pictures of children are there to view. He said he spends most of his time not wearing clothes & looking at these pictures online. He said that he "prefers little girls between ages 13 & 16." He said he was caught for the 5 yr old but likes young teen girls.

He said that I don't have anything to worry about because I have 3 little boys (ages 6, 5, & 2) & he likes girls. I told him I had to go home & he asked me to come back because he had a lot more to tell me. He asked me not to tell anyone and said I was the only one in Cuba City he has told. He said he felt like he had to tell me because he was my neighbor & I have young kids.

I went home & packed my things. We stayed at my mom's & I moved out the next day 10/5/15. I refuse to live by someone like him!

R. 18-2 at 4–6. In addition to her certification on the first page of the statement, Leppert signed the final (third) page of her statement. R. 18-2 at 6.

Based on what Leppert had told him, Terpstra decided to immediately seek a search warrant for Geasland's apartment. In addition to preparing a police report which summarized his conversation with Leppert, Terpstra completed a brief affidavit in support of the warrant application that attached his report and Leppert's written statement. The affidavit included the following representations concerning the house where Geasland lived and Terpstra's impression as to Leppert's credibility:

> 3.  Affiant knows that 317 S. Main Street is a two story house divided into a lower and upper apartment. The upper apartment is the apartment in question. The downstairs apartment is now vacant. The upstairs apartment door is the door farthest to the West. The door is described as a solid white door with no screen on the front. The house is multi colored with red siding on the lower half and Tan on the upper half. The windows have a red trim around the outside. The house is located on Main St. but has no doors at the front. The house is the fo[u]rth property to the South of Calhoun St. The subject resides by himself in the upper apartment, 317 ½ Main St.
>
> 4.  Affiant states that he believes the information from Susan Leppert to be truthful and reliable based upon her status as a citizen informant.

R. 18-2 at 1. The certification on Terpstra's affidavit represented that its contents were "true to his own knowledge" except as otherwise indicated. R. 18-2 at 1. The affidavit was notarized by Lisa Riniker, who happened to be the Grant County District Attorney, acting in her capacity as a notary public.[1]

A state court issued a warrant authorizing the search of Geasland's apartment, and on the evening of October 6 (the same day Leppert had made her report to Terpstra), local and state police officers executed the warrant. Within the apartment, they discovered, among other items, a 500 gigabyte external computer hard drive, which they seized. Geasland was arrested based on certain incriminating statements he made during the search (these were later suppressed) and a preliminary on-site examination of the external drive which confirmed it contained pornographic images of children.

---

[1] Terpstra's police report represented that he would be applying for a search warrant "through the Grant County District Attorneys office," R. 18-2 at 3; and Terpstra later represented that he indeed discussed the matter with Riniker, who agreed that there was probable cause for the search, R. 15-2 at 1. The parties agree that a police officer's consultation with a prosecutor while preparing the application for a warrant can support a finding that the officer relied in good faith on the issuance of a warrant. *See United States v. Pappas*, 592 F.3d 799, 802 (7th Cir. 2010) (collecting cases). However, the warrant application in this case did not disclose Terpstra's consultation with Riniker, and we do not, as the government would have us do, interpret her mere notarization of Terpstra's affidavit as confirmation that she agreed the contents of the warrant application established probable cause and had conveyed that assessment to Terpstra.

Police subsequently obtained a second warrant authorizing a full forensic examination of the drive and the other electronic devices seized from the apartment. On the drive were thousands of pornographic images of young children.

Three weeks after Geasland was taken into custody,[2] a federal complaint (supported by an affidavit from Terpstra) was filed charging Geasland with the possession of child pornography. In a superseding indictment dated March 9, 2016, a grand jury charged him with one count of violating 18 U.S.C. § 2252(a)(4)(B) by knowingly possessing a hard drive containing child pornography (with a requisite connection to interstate commerce).

As relevant here, Geasland moved to suppress the evidence seized in the search of his apartment, but the district judge, on the recommendation of the magistrate judge, denied the motion. The thrust of Geasland's motion was that because the police had done nothing to confirm the veracity of the account Leppert had given to Terpstra, and because Leppert was not otherwise a known informant with a track record of supplying accurate information to the police, her statement alone plainly did not supply probable cause to search Geasland's apartment.

Magistrate Judge Crocker thought that the probable cause question was closer than Geasland's counsel made it out to be, but it seemed to him that the search warrant was issued without probable cause as Geasland maintained. R. 38 at 7, 12-–13. He pointed out that Leppert was a concerned citizen whose name and address were known to the police, and she had given them a "vivid and disturbing account, rich in detail" pointing to the commission of a crime by Geasland. R. 38 at 9. Yet, as Geasland pointed out, the police had not corroborated Leppert's statement in any way; nor had they presented Leppert to the judge who issued the warrant, which would have permitted him to evaluate her credibility. R. 38 at 10–12. However, even if probable cause was lacking, the magistrate judge reasoned, the good faith exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405 (1984), applied so as to render the fruits of the search admissible against Geasland. In the magistrate judge's view, the warrant was not so lacking in probable cause as to foreclose Terpstra from reasonably relying on the warrant's issuance. Terpstra had met with Leppert and had determined her to be credible. Moreover, although Terpstra had not so noted in the

---

[2] Prior to being charged by federal authorities, Geasland was detained in the Grant County jail for a period of 21 days, apparently without being charged by local authorities and without being given access to an attorney. His initial detention was the subject of a motion to dismiss the federal case against him for outrageous government conduct. The district court denied that motion. Geasland does not raise it in this appeal.

warrant application, he had checked the sex offender registry and confirmed that Geasland had a prior conviction for child molestation. R. 38 at 14–15. In view of these circumstances, it would not have been clear to Terpstra that the warrant was invalid. R. 38 at 15.

Judge Peterson adopted the magistrate judge's recommendation to deny the motion to suppress. He was confident that had Terpstra included Geasland's confirmed status as a sex offender in the warrant application, there would have been probable cause to issue the warrant. R. 56 at 2. Absent corroboration of that point in the application, however, Judge Peterson agreed with Magistrate Judge Crocker that the warrant had been issued without probable cause. R. 56 at 2. But he also agreed that the good faith exception rescued the results of the search from exclusion at trial: the warrant was not so lacking in probable cause as to foreclose Terpstra from relying on the warrant's issuance. Focusing solely on the information that had been presented to the judge who issued the warrant, Judge Peterson was satisfied that Terpstra reasonably could have thought the warrant to be valid. R. 56 at 3–4. Pointing to our decisions in *Gramenos v. Jewel Cos., Inc.*, 797 F.3d 432 (7th Cir. 1986), and *United States v. Decoteau*, 932 F.2d 1205 (7th Cir. 1991), which had sustained a warrantless arrest and automobile search based on uncorroborated witness statements, the judge reasoned that the warrant application in this case was not "plainly deficient." R. 56 at 4. "Leppert's sworn statement was filled with factual detail that made it facially plausible" notwithstanding the lack of corroboration. R. 56 at 4. And the fact that Terpstra met with Leppert, had the opportunity to question her, and evaluated her credibility indicated that he relied on the warrant's issuance in good faith. R. 56 at 4.

With his motion to suppress having been denied, Geasland opted to plead guilty. His plea agreement reserved the right to appeal the denial of the suppression motion.

In advance of sentencing, Judge Peterson determined that Geasland was subject to a mandatory 10-year term of imprisonment in view of his prior state conviction for sexual assault of a minor. The enhanced minimum term is triggered, *inter alia*, by a defendant's prior conviction under a state law "relating to aggravated sexual abuse, sexual abuse, or abusive sexual contact involving a minor or ward." § 2252(b)(2).

The issue as presented to the district court was straightforward: was the state offense of which Geasland had been convicted fully equivalent to one of the federal statutory sexual abuse crimes set forth in Chapter 109A of Title 18, in the sense that the essential elements of the two offenses matched. Neither party considered whether, short of complete equivalence, the state conviction might still qualify as a predicate offense under an alternative rationale; implicitly, the parties had agreed that an element-by-element comparison of the state and federal statutes would render a yes-or-no answer.

That agreement rendered it unnecessary for the court to hypothecate generic federal offenses of a kind specified by section 2252(b)(2) and to compare the elements of Geasland's state conviction to such a generic offense. R. 73 at 4–5. It also obviated any need to consider whether the state law underlying his conviction might "relate[ ] to" a sexual abuse offense even if the elements of the state offense did not in all respects match those of the federal offense (be it statutory or generic). R. 73 at 3–4.

On that understanding, the court undertook a categorical analysis comparing the elements of Geasland's 1984 conviction in Wisconsin for first degree sexual assault, *see* Wis. Stat. § 940.225(1)(d), with the elements of the federal crime of abusive sexual contact, *see* 18 U.S.C. § 2244(a)(5). The Wisconsin statute provided that one was guilty of first degree sexual assault if he "[h]a[d] sexual contact or sexual intercourse with a person 12 years of age or younger." § 940.225(1)(d) (1984). "Sexual contact" was defined as

> any intentional touching by the complainant or defendant, either directly or through the clothing by the use of any body part or object, of the complainant's or defendant's intimate parts if that intentional touching is either for the purpose of sexually degrading[,] or for the purpose of sexually humiliating the complainant or sexually arousing or gratifying the defendant *or if the touching contains the elements of actual or attempted battery under s. 940.19(1).*

Wis. Stat. § 940.225(5)(a) (emphasis ours).

Thus, as Geasland emphasized to the district court, one could commit first degree sexual assault by intentionally touching, through clothing, an intimate body part of a person 12 years or younger under circumstances constituting actual or attempted battery. "Intimate parts" were defined to include the "breast, buttock, anus, groin, scrotum, penis, vagina or pubic mound of a human being." *Id.* § 939.22(19). And the Wisconsin battery statute proscribed "caus[ing] bodily harm to another by an act done with intent to cause bodily harm to that person or another without the consent of the person so harmed." Wis. Stat. § 940.19(1). "Bodily harm," finally, was defined as "physical pain or injury, illness, or any impairment of physical condition." Wis. Stat. § 939.22(4). In sum, under Wisconsin law, one could commit first degree sexual assault by intentionally touching the intimate body part of a person 12 years old or younger with the aim of causing pain, and absent any intent to sexually degrade or humiliate the victim or to sexually arouse or gratify the defendant. In theory, as Geasland points out, kicking a child in the groin or the buttocks with an intent to cause pain might constitute such an offense. *Cf. State v. Olson*, 335 N.W.2d 433, 436–37 (Wis. Ct. App. 1983) (twisting and pulling minor victim's penis); *State v. Bonds*, 477 N.W.2d 265, 267 (Wis. 1991)

(comparable statutory provision covering adult victims) (twisting victim's nipple). As Judge Peterson observed, the statute thus had a "somewhat unconventionally broad scope." R. 73 at 3.

But, as Judge Peterson went on to conclude, the state statute in actuality was no broader in the range of conduct it reached than the federal statute covering abusive sexual contact with a minor. Section 2244(a)(5) makes it a crime for someone within federal jurisdiction to "knowingly engage[ ] in or cause[ ] sexual contact with or by another person, if to do so would violate—subsection (c) of section 2241 of this title, had the sexual contact been a sexual act[.]" Section 2241(c) in turn makes it a crime to cross state lines "with intent to engage in a sexual act with a person who has not yet attained the age of 12 years." Section 2246(3) defines "sexual contact" to mean "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person within an intent to *abuse*, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." (Emphasis ours.) Thus, setting aside the jurisdictional elements of the federal statutes, one commits aggravated sexual contact if he, inter alia, touches the (clothed or unclothed) genitalia, anus, groin breast, inner thigh, or buttocks of a person under the age of 12 with the intent to abuse that person. Judge Peterson pointed out that there is surprisingly little case law on what "abuse" means in this context, but looking to common definitions, he concluded that in the context of sexual abuse it means touching an intimate body part that is "wrongful" or "harmful"; the term thus serves to distinguish touching that takes place for innocent or helpful purposes (as by a physician) from touching for an improper purpose, including inflicting pain. R. 73 at 6–8. And so Judge Peterson concluded that the federal statute was equivalent to the 1984 version of the state statute in the sense that it reaches a non-sexual battery upon an intimate body part. R. 73 at 8.

One important distinction between the two statutes went unnoticed by the parties and by the district court. Whereas the state sexual assault statute was addressed to victims aged 12 and under, section 2245(a)(5), with its cross-reference to section 2241(c), applies to victims 11 and under. Thus, there is a mismatch between the two statutes to the degree that one could have violated the Wisconsin statute, but not the federal statute, by wrongfully touching a 12-year-old. That distinction is highlighted by Geasland on appeal, but it was not one that was raised or addressed below.

Absent the determination that Geasland's prior conviction qualified as a crime related to abusive sexual contact of a minor, the range of imprisonment advised by the Sentencing Guidelines would have been 51 to 63 months; with that determination, the judge was required to impose a minimum term of no less than 10 years (which became the Guidelines range by default). Judge Peterson concluded that a term longer than the

statutory minimum was not warranted, and he thus ordered Geasland to serve a prison term of 120 months.

## II.

Geasland contends on appeal that the district court erred in denying his motion to suppress the evidence seized in the search of his apartment, because the warrant application so obviously failed to establish probable cause to believe that Geasland was engaged in criminal activity that Terpstra and the other officers who executed the search warrant could not in good faith have believed otherwise. He also challenges the district court's finding that he was subject to the mandatory 10-year minimum term, reasoning that his prior state conviction cannot be treated as a predicate offense for purposes of the enhanced minimum term in view of the age mismatch between the state and federal statutes proscribing abusive sexual contact with a minor.

A.     Denial of motion to suppress

We review the denial of Geasland's motion to suppress the evidence seized in the search of his apartment, which is premised on an undisputed set of facts, de novo. *E.g.*, *United States v. Reed*, 744 F.3d 519, 522 (7th Cir. 2014) (district court's application of *Leon*'s good faith exception to exclusionary rule subject to plenary review). The government concedes for purposes of this appeal that the warrant authorizing the search was not supported by probable cause. The question, then, is whether the evidence is nonetheless rendered admissible by *Leon*'s good faith exception to the exclusionary rule. *Leon* holds generally that the fruits of a search should not be suppressed when officers have reasonably relied on the issuance of a warrant by a detached and neutral judicial officer in executing the search. 468 U.S. at 920–22, 104 S. Ct. at 3419–20. Reliance on the warrant is deemed reasonable unless (1) the issuing judge was misled by information in the warrant application that the warrant affiant knew to be false or would have known was false but for his reckless disregard for the truth; (2) the judge wholly abandoned his neutral and detached role in issuing the warrant; or (3) the warrant was so deficient on its face that the officers executing the warrant could not reasonably presume the warrant to be valid. *Id.* at 923, 104 S. Ct. at 3421. The third exception to reliance on the warrant is the one relevant here, as there is no suggestion that the judge who issued the warrant abandoned his role as an independent decisionmaker or that Terpstra provided him with false information in seeking the warrant. Geasland's contention is that the warrant was deficient on its face because it would have been obvious to any reasonable police officer that the uncorroborated information Terpstra submitted in support of the warrant did not establish probable cause to believe that Geasland was involved in criminal activity.

Geasland reasons that the law was clear at the time of the search that an uncorroborated statement from a citizen informant was insufficient to supply probable cause for the search of his apartment. Given prior precedents which have found probable cause wanting when the government has relied on the uncorroborated statement of an informant, *e.g.*, *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002), Geasland argues that the officers executing the search warrant on his residence could not in good faith have believed that the warrant was supported by probable cause. He distinguishes the *Gramenos* and *Decoteau* cases cited by Judge Peterson which sustained an arrest and automobile search, respectively, partly on the particular facts of those cases but also on the broad ground that they did not involve the search of a defendant's home, the sanctity of which is a prime focus of the Fourth Amendment, *see, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 1290 (2004).

As the point is not disputed, we will proceed from the premise that the warrant authorizing the search of Geasland's apartment was not supported by probable cause. Leppert's statement certainly provided a specific, coherent, and facially plausible account of criminal conduct on Geasland's part and gave the authorities reason to believe that evidence of that conduct would be found in a search of the apartment.[3] And given Leppert's status as a citizen informant (a point to which we return below) her statement went a long way, if not all of the way, to establishing probable cause for the search. Yet Terpstra did next to nothing in the warrant application to corroborate Leppert's account, notwithstanding any number of points that could readily have been verified, including in particular Geasland's status as a registered sex offender and Leppert's status as a tenant in the apartment below Geasland's.[4] Terpstra, of course, later testified that he did confirm Geasland's status as a sex offender—a point that appears to be undisputed—but because he inexplicably failed to disclose that in his own affidavit, the confirmation lends no support to the warrant or his reliance upon the warrant. *See, e.g.*, *Koerth*, 312 F.3d at 866 (where affidavit is sole evidence presented to judicial officer who issued warrant, "the warrant must stand or fall solely on the contents of the affidavit") (quoting *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967)). The sole respect in which Terpstra's affidavit corroborates Leppert's account is

---

[3] For purposes of this appeal, there is no dispute that the facts as Leppert recounted them reasonably suggested that Geasland was engaged in criminal activity—specifically, the possession of child pornography. The issue as presented to us is limited to the lack of corroboration of Leppert's statement.

[4] The record indicates that the owner of the two-flat operated a business around the corner from that building.

in verifying that a two-unit residence existed at the address she referenced and that the lower apartment was currently vacant.[5] That extremely limited confirmation did not meaningfully corroborate the substance of Leppert's statement.

Proceeding from the premise that probable cause was lacking, we must ask whether Terpstra and the other officers who conducted the search nonetheless could have relied in good faith upon the issuance of the search warrant. Specifically, as we noted above, we must consider whether, as Geasland maintains, it would have been obvious to any reasonable police officer that probable cause was absent.

"Probable cause is a practical, nontechnical inquiry that asks whether there is a fair probability, given the totality of the circumstances, that evidence of a crime will be found in a particular place." *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir.2009). It is "a fluid concept—turning on the assessment of probabilities in particular factual contexts," *Illinois v. Gates*, 462 U.S. 213, 232, 103 S. Ct. 2317, 2329 (1983), and as our colleagues in the Tenth Circuit have observed, "the value of informants' tips in establishing probable cause is as varied as the myriad of fact situations in which they arise."*J.B. v. Washington County*, 127 F.3d 919, 929 (10th Cir. 1997).

As we noted in *Koerth*, where an informant's tip supplies the basis for a search warrant, the totality-of-the-circumstances inquiry encompasses multiple factors, including: (1) the extent to which the police have corroborated the informant's statements; (2) the degree to which the informant has acquired knowledge of the events through firsthand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and the police officer's application for the search warrant. 312 F.3d at 866. A court should also consider whether the informant personally appeared and presented an affidavit or testified before the issuing judge, allowing him or her to evaluate the informant's knowledge, demeanor, and sincerity. *Id.*

Several of these factors suggest that it would have been reasonable to think that Leppert's account supplied probable cause to search Geasland's apartment, as both the magistrate judge and district judge pointed out below. First, Leppert was not repeating rumor or hearsay in her statement but rather self-incriminating remarks that Geasland himself had made to her; his statements would have been admissible against him at trial. Fed. R. Evid. 801(d)(2)(A); *see*, *e.g.*, *United States v. Maholias*, 985 F.2d 869, 877 (7th

---

[5] Terpstra represented that the averments of his affidavit were made on his own knowledge, so we agree with the government that his affidavit is reasonably construed to mean that he had confirmed and/or knew that the subject premises were as described in the affidavit.

Cir. 1993). Second, Leppert's statement was specific and straightforward as to the details of Geasland's criminal activity, his criminal history, and the circumstances under which he had disclosed these details to Leppert. Third, Leppert was describing events which had taken place barely two days prior, so there was no reason to doubt her recollection.

The two remaining factors, on the other hand, obviously weaken the case for probable cause. Terpstra, as we have already discussed, did nothing to meaningfully corroborate Leppert's story, notwithstanding the fact that he had the opportunity and means to do so. Moreover, Leppert herself was not presented as a witness to the judge who issued the warrant, such that there was an opportunity for the judge himself to evaluate her credibility.

As Geasland points out, there are multiple cases from this court (pre-dating the search of his apartment) which either held or assumed that probable cause was lacking in the absence of information affirmatively speaking to an informant's credibility. *See generally United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) ("Cases that test the sufficiency of affidavits for warrants obtained based on informants are highly fact-specific, but information about the informant's credibility or potential bias is crucial."); *see also, e.g., United States v. Bell*, 585 F.3d 1045, 1049–52 (7th Cir. 2009); *United States v. Peck*, 317 F.3d 754, 756–57 (7th Cir. 2003); *Koerth*, 312 F.3d at 867–68; *cf. United States v. Searcy*, 664 F.3d 1119, 1123 (7th Cir. 2011) ("given the fact that the informant's previous dealings with the police led to three arrests in the past six months, and, as the magistrate judge in the current case noted, because the informant faced criminal prosecution for furnishing false information to police, the informant's information was sufficiently reliable to compensate for its lack of detail"). If Leppert had been an anonymous tipster or the sort of informant with a monetary or penal interest in helping herself by inculpating others, we agree that such cases might have made it obvious that the search in this case was not supported by probable cause, the issuance of a warrant notwithstanding.

But this is where Leppert's status as a citizen informant with direct knowledge of criminal activity becomes important. For purposes of the probable cause inquiry, our case law has generally drawn a distinction between anonymous tips, on the one hand, and information provided by an eyewitness or victim to a crime. As we explained in *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998), which dealt with probable cause to arrest:

> "When an officer has 'received his information from some person—normally the putative victim or an eyewitness—who it seems reasonable to believe is telling the truth,' he has probable cause" to arrest

the accused perpetrator. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir.1986) (quoting *Daniels v. United States*, 393 F.2d 359, 361 (D.C. Cir.1968)); *see also Tangwall v.* [*Stuckey*], 135 F.3d [510] at 519 [(7th Cir. 1998)] (quoting *Gramenos*); *United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir. 1991); *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir.1988) (citation omitted). Thus, when a supermarket security guard witnesses an individual shoplifting, and the police arrest the individual based on the guard's report, qualified immunity shields the arresting officers fro m § 1983 liability. *See Gramenos*, 797 F.2d at 439. Similarly, if a rape victim positively identifies her attacker to a police officer more than two months after the assault occurred, and that officer, in turn, relays the identification to a second officer who then makes the arrest, both officers are entitled to qualified immunity from suit under § 1983. *See Tangwall*, 135 F.3d at 520. So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest, and their actions will be cloaked with qualified immunity if the arrestee is later found innocent. *See id. (*"Because the law is clear that a believable victim's single identification can provide the basis for probable cause, a reasonable officer would thus have believed that Tangwall's arrest was constitutionally valid at that point in time.").

*See Matthews v. City of E. St. Louis*, 675 F.3d 703, 706–07 (7th Cir. 2012); *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (per curiam); *see also J.B. v. Washington County*, *supra*, 127 F.3d at 929–30 ("[C]ourts traditionally have distinguished between anonymous tipsters, whose motives and bases of knowledge are unknown to the investigating officers, and ordinary citizens who identify themselves and report crimes to the police. Although the courts have eschewed rigid rules, the probable cause case law emphasizes the importance of corroboration of some amount of the anonymous tipster's information in establishing probable cause, while presuming the reliability of citizen informants.") (citations omitted).

A similar distinction can be drawn with informants who themselves are implicated in criminal activity. In contrast to citizen informants, informants who have been arrested or who have been accused of wrongdoing have a motive to cast blame elsewhere and secure credit for cooperating with the authorities. *See United States v. Olson*, 408 F.3d 366, 370–01 (7th Cir. 2005) ("Joseph was not just an informant, but a newly-arrested informant, and as such merits a greater dose of skepticism when assessing his credibility) (citing *Williamson v. United States*, 512 U.S. 594, 607–08, 114

S. Ct. 2431, 2439 (1994) (Ginsburg, J., concurring in part & concurring in judgment) ("A person arrested in incriminating circumstances has a strong incentive to shift blame or downplay his own role in comparison with that of others, in hopes of receiving a shorter sentence and leniency in exchange for cooperation.")).

Like an eyewitness to a crime, Leppert gave a report of criminal activity—admitted to her by the perpetrator himself—that Terpstra had reason to think was reliable. She came forward voluntarily. She supplied her name and address to Terpstra. She gave a statement in her own hand that was specific, detailed, and plausible. Certain aspects of the account gave it an air of authenticity, including Leppert's discussion of the terms "pedophile" and "hebephile" (the latter term being one with which most people would not be familiar) and that Geasland used a private online network to view pictures of naked children (a common modus operandi in the world of child pornography that the typical layperson would not be likely to know). There was nothing internally inconsistent or implausible in Leppert's account (with the possible exception of Geasland's candor) that would have given Terpstra reason to question her veracity. A number of the details she recounted (including Geasland's prior conviction) could easily be checked and proven true or false. Terpstra, of course, had the opportunity to question Leppert and, per his affidavit, found her to be credible. *See Decoteau*, 932 F.2d at 1207 ("[I]f it seems reasonable to the police to believe that the eyewitness was telling the truth, they need not take any additional steps to corroborate the information regarding the crime before taking action."); *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) ("in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth").

Geasland points out that Leppert, in contrast to the security guard in *Gramenos*, whose eyewitness account of shoplifting was deemed to supply probable cause for an arrest, did not face a risk comparable to discharge if her statement proved false. *See* 797 F.2d at 439 ("The chance that the complainant is pursuing a grudge, a risk in believing an unknown witness, is small in an institutional setting. The guard who pursues a private agenda may be fired and disgraced …"); *Edwards v. Cabrera*, 58 F.3d 290, 294 (7th Cir. 1995). That is a fair point. But we cannot say that the distinction would have precluded the police from relying on Leppert's account. Having come forward on her own initiative, identified herself to the authorities, and put her accusations in writing, Leppert put her reputation if not her liberty on the line. As we have said, multiple aspects of her statement were readily subject to verification, and at a minimum, she exposed herself to a misdemeanor charge of obstructing a police officer in the event such efforts proved her account to be false. *See* Wis. Stat. § 946.41(1) & (2)(a). Moreover,

in signing her written statement, Leppert expressly certified that her report was true. Even if the certification (as opposed to a sworn oath) did not expose her to additional legal consequences in the event her statement were fabricated, she might well have thought so. Terpstra, in turn, might reasonably have believed the certified written statement would carry more weight in the probable cause analysis than an uncertified written or oral statement.

Certainly one can postulate reasons for Leppert to have falsely accused Geasland of a crime, as Geasland has suggested. Someone in Leppert's position, having discovered her neighbor's status as a convicted sex offender, might have wanted him removed from the apartment above hers and concocted the story about his consumption of child pornography toward that end. But there was nothing to indicate that Leppert was pursuing a personal agenda in reporting Geasland. (Indeed, it is not hard to imagine that she might have had Geasland evicted by their landlord had she simply reported his status as a sex offender. Geasland told her that no one else in town was aware of his past.) Her statement was facially plausible, and she would have to have been quite clever to give such a detailed account. In the absence of clues casting doubt upon her account, the police were not obliged to affirmatively rule out the possibility that she was lying.

A second distinction with *Gramenos* also proves to be immaterial. *Gramenos* dealt with an arrest rather than the search of a residence, and, as noted earlier, the sanctity of one's home lies at the core of the privacy protected by the Fourth Amendment. *See Groh*, 540 U.S. at 559, 124 S. Ct. at 1290. But taking a person into police custody is as grave an intrusion upon his liberty and privacy as a search of his home, so we do not discount the value of arrest precedents in this context. *See Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379 (1980).

Under all of these circumstances, probable cause to search Geasland's apartment was not so clearly absent that Terpstra and the other officers could not in good faith rely on the issuance of the warrant. By no means do we mean to endorse Terpstra's failure to include some meaningful corroboration of Leppert's statement in the application for the warrant. But given Leppert's status as a citizen informant and the detailed and plausible account she had given to Terpstra, we do not believe good-faith reliance upon the warrant was precluded.

B.        Prior state conviction

The district court determined that Geasland was subject to a mandatory 10-year prison term under section 2252(b)(2), in view of his prior conviction in Wisconsin state court for first degree sexual assault. Section 2252(b)(2) is one of several like sentencing

enhancements found in statutes proscribing the sexual exploitation of minors and the possession, transportation, and distribution of child pornography. *See* §§ 2252(b)(1); 2252A(b)(1) & (2). An enhanced term is mandated when the defendant, as relevant here, has a prior conviction pursuant to a state law "relating to aggravated sexual abuse, sexual abuse, or abusive sexual contact." § 2252(b)(2). The language following the phrase "relating to" corresponds closely with the captions of several offenses set forth in Chapter 109A of the federal criminal code criminalizing various forms of sexual abuse. Section 2244(a)(5), in particular, proscribes abusive sexual contact with a child under the age of 12. The parties in this case agreed below that this federal statute was the one most similar to the Wisconsin statute under which Geasland had been convicted previously and consequently was the benchmark against which the state offense should be evaluated.

As the district court did in this case, courts generally apply the categorical approach set forth in *Taylor v. United States*, 495 U.S. 575, 599–602, 110 S. Ct. 2143, 2158–60 (1990), in deciding whether a defendant's prior conviction in state court was for an offense "relating to" one of the types of offenses set forth in section 2252(b)(2) and like enhancements. *See United States v. Osborne*, 551 F.3d 718, 721 (7th Cir. 2009). That approach in the current context requires the court first to identify the federal offense with which the state conviction is to be compared, and then examine the elements of the state statute under which the defendant was convicted to see whether they correspond with the elements of the federal offense; the aim of the comparison is to determine whether the state offense reaches conduct that the federal offense does not. *See id.* If the state statute contains alternative elements, such that some forms of the offense may qualify as predicates when compared with the federal offense while other forms do not, then the court pursuant to a modified categorical approach is permitted to look at a limited category of documents (including for example the indictment or information) in order to ascertain with what form of the offense the defendant was charged. *See Descamps v. United States*, 133 S. Ct. 2276, 2283–85, 2293 (2013); *Shepard v. United States*, 544 U.S. 13, 125 S. Ct. 1254 (2005); *Osborne*, 551 F.3d at 721. But regardless of whether the court is engaging in a categorical or modified categorical approach, the relevant inquiry focuses on the offense of conviction and its elements, not the particular facts underlying the conviction. *Id.* Consequently, in examining Geasland's 1984 conviction for first degree sexual assault, it matters not what the age of his victim was or the particular way in which he abused her. What matters is what the Wisconsin statute required to be proven, and whether the offense as Wisconsin defined it was broader than the corresponding federal offense.

As we detailed above, Judge Peterson, after comparing the elements of the state offense with the federal offense of abusive sexual contact set forth in section 2244(a)(5), found that they were equivalent. Geasland has pointed out on appeal, however, that there is actually a mismatch between the state and federal offenses with respect to how old the victim of the offense can be. Applying plain error review, however, we conclude that it is not clear, in retrospect, that the difference in the maximum age of the victim forecloses the conclusion that the state conviction was pursuant to a state law "relating to" abusive sexual contact with a minor.

At this point, there is no dispute that the Wisconsin offense of which Geasland was convicted is broader than its federal counterpart to the extent that the victim of the state offense could be as old as 12, whereas the federal statute caps the victim's age at 11. The age mismatch between the two statutes is obvious, in retrospect, and it would be dispositive for purposes of the plain error analysis assuming that there necessarily must be 1:1 correspondence between the elements of the state and federal offenses.[6] That indeed was the parties' and the court's operating assumption below. In contending that the offenses diverged, Geasland focused on the type of conduct prohibited and made no mention of the victim's maximum age; his argument was that the state offense as defined was broader than the federal offense in that the former reached the touching of an intimate body part that was committed without an intent either to sexually gratify the abuser or to humiliate the victim. But the district court was satisfied that the statutes matched in the type of conduct they proscribed, in that both reached the touching of intimate body parts with an intent to cause pain. Even so, given that the state offense included a set of victims that the federal offense does not—namely, 12-year-olds—then the two are not fully equivalent. If full equivalence is required, and there is no other potential offense equivalent to Geasland's state conviction, then he was not subject to the 10-year statutory minimum prison term and necessarily was prejudiced by the district court's error in finding that he was.

But as we shall explain in a moment, the age mismatch may not inevitably foreclose the statutory enhancement. To establish plain error entitling him to relief, then, Geasland must convince us that there is no alternative rationale pursuant to which section 2252(b)(2) might have required him to be sentenced to a term of no less than 10

---

[6] There are other federal statutes that reach the sexual abuse of minors aged 12 and over, but those statutes contain requirements that the Wisconsin statute did not. *See* 18 U.S.C. §§ 2241(c) (use of force, threat, or drug or intoxicant); 2242(2) (person incapable of understanding or undertaking act); 2243(a) (offender at least four years older than minor).

years. Absent such a showing, Geasland cannot establish that the error with respect to the age mismatch did not affect his substantial rights. *See, e.g.*, *United States v. Prude*, 489 F.3d 873, 880–81 (7th Cir. 2007) (on plain error review defendant bears burden of showing that his substantial rights were affected in the sense that the result of the proceeding would have been different but for the error).

Recognizing the disadvantage at which plain error review places him, Geasland contends at the outset that because he argued below that there is a fatal mismatch between the state and federal offenses, he did not forfeit the argument over the age divergence notwithstanding his omission to raise that particular point with the district court. We disagree. Although, as Geasland points out, we have been willing to treat as preserved an argument that was made below but given "a new twist" on appeal, *United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008), his argument as to the age mismatch is more than a modest expansion upon or variant of his challenge in the district court. As presented to the district court, the parties' arguments presumed that a full element-by-element match between the Wisconsin offense and section 2244(a)(5) was required; and because the district court agreed with the government that the state law underlying Geasland's conviction was no broader than the federal offense in the sort of abusive conduct proscribed, the court (understandably) found it unnecessary to consider (a) whether the state offense might be one "relating to" the federal offense even if the former were broader in one respect than the latter, or (b) whether the relevant federal comparator ought to be a generic offense rather than one of the statutory sexual abuse offenses set forth in Chapter 109A. Had the age mismatch been argued, then the government no doubt would have pursued these possibilities (as it does now in defending the sentence) and the district court would have addressed them. We, in turn, would have the benefit of a fully developed record on these possibilities (*i.e.*, lower court findings and rationale for us to review). This makes clear how Geasland's failure to argue the age point significantly altered the proceeding below and why, as in any other case where the defendant pursues an objection on appeal that he did not make below, our analysis should be confined to one for plain error. *See, e.g.*, *United States v. Faruki*, 803 F.3d 847, 856 (7th Cir. 2015).

Thus, given his forfeiture, Geasland must demonstrate not only that the district court committed error, but that the error was plain in the sense that it is obvious in retrospect, that it affected his substantial rights in that he would not have been subject to the statutory enhancement absent the error, and that the error seriously impugns the fairness, integrity, or public reputation of the proceedings. *See United States v. Brown*, — F.3d —, 2017 WL 3205805, at *6 (7th Cir. July 28, 2017) (elements of plain error); *United States v. Seifer*, 800 F.3d 328, 329–30 (7th Cir.) (per curiam) (defendant has burden

on plain error review to show, *inter alia*, that error affected his substantial rights), *cert. denied*, 136 S. Ct. 430 (2015); *Prude, supra*, 489 F.3d at 880–81 (to establish that error affected his substantial rights, defendant must show that result of proceeding would have been different but for error). Two aspects of section 2252(b)(2) make Geasland's burden on plain error review particularly difficult.

First, section 2252(b)(2) indicates that the state conviction must be one "relating to" to a federal sexual abuse offense. The words "relating to," are consistently recognized as broad in meaning. *E.g., Mellouli v. Lynch*, 135 S. Ct. 1980, 1990 (2015); *Dist. of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129, 113 S. Ct. 580, 583 (1992). Consistent with that language, we have said that the state offense in question must be similar to one of the sexual abuse crimes identified in Title 18, *Osborne*, 551 F.3d at 721, adding that "[s]imilar is not necessarily identical," as the federal statutes have jurisdictional elements that the state laws do not, and there are forms of sexual abuse that the federal statutes do not reach that the states have recognized as criminal, *id. See also, e.g., United States v. Sinerius*, 504 F.3d 737, 743 (9th Cir. 2007) (identical "relating to" language found in 18 U.S.C. § 2252A "mandates the enhancement for any state offense that stands in some relation, bears upon, or is associated with th[e] generic [sexual abuse] offense") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 2037 (1992)); *United States v. Colson*, 683 F.3d 507, 511–12 (4th Cir. 2012) (collecting cases).[7]

---

[7] We are mindful of the Supreme Court's admonition in *Mellouli* that "relating to" should not be given an *overly* broad meaning. In that case, the alien petitioner had been ordered deported based on the Board of Immigration Appeals' finding that his misdemeanor conviction for possessing drug paraphernalia was pursuant to a state law "relating to" a controlled substance as defined by federal statute. *See* 8 U.S.C. § 1227(a)(2)(B)(i). But the petitioner had been convicted of using a sock to conceal tablets containing one of nine drugs classified as controlled substances under state law but not on the federal narcotics schedules. Under those circumstances, the Supreme Court thought it would stretch the meaning of "relating to" beyond the breaking point to say that the petitioner had been convicted under a state law relating to a controlled substance simply because he had used drug paraphernalia—the sock—to hide pills not categorized as controlled substances by federal law. 135 S. Ct. at 1990. As other courts have said, the relatively unique facts of *Mellouli* do not counsel against a broad reading of the phrase "relating to" as used in section 2252(b)(2) and similar statutory sentencing enhancements. *See United States v. Bennett*, 823 F.3d 1316, 1322–25 (10th Cir.) (collecting cases), *cert. denied*, 137 S. Ct. 319 (2016).

This leads the government to argue there that although the state offense of which Geasland was convicted in 1984 reached minors as old as 12, it relates to the federal offense of abusive sexual contact notwithstanding the fact that the latter offense does not reach victims over the age of 11. The sort of conduct reached by the two statutes is the same; the Wisconsin statute simply reached a slightly broader class of victims by including 12-year-olds. The government's argument is not implausible: other circuits have concluded that sexually abusive conduct reached by state statutes may be considered related to the federal offenses even though not actually criminalized by federal statute. *Cf. United States v. Bennett*, *supra* n.7, 823 F.3d at 1321–25 (state offense of sexual exploitation of child, including possession of sexually exploitative materials, was offense "relating to" possession of child pornography, for purposes of section 2252A(b)(2), notwithstanding possibility that state law might punish visual depictions that would fall outside federal definition of child pornography); *United States v. Sullivan*, 797 F.3d 623, 640–41 (9th Cir. 2015) (state offenses of sexual intercourse and oral copulation with a minor under 16 years of age were crimes "relating to" sexual abuse of a minor for purposes of sections 2251(e) and 2252(b)(2) , notwithstanding lack of mens rea element, in that they pose risk of physical or psychological harm in light of age of victim); *United States v. Sonnenberg*, 556 F.3d 667, 670–71 (8th Cir. 2009) (state statute proscribing lascivious acts with children was one "relating to" sexual abuse of minor for purposes of section 2252(a)(2) and 2252(b)(1) notwithstanding fact state offense did not require physical contact with victim); *United States v. Hubbard*, 480 F.3d 341, 347 (5th Cir. 2007) (state law criminalizing attempt to make lewd or indecent proposals to child under age of 16 to have unlawful sexual relations or sexual intercourse was one "relating to" sexual abuse of minor for purposes of section 2252A(b)(1)) notwithstanding fact that putative victim of offense was actually adult detective and physical contact with victim was not required). Although none of these cases addresses a mismatch in age, we have a hard time saying that a modest mismatch in age forecloses the notion that the state offense relates to the federal offense whereas a mismatch in the range of abusive conduct reached by the two statutes does not. We are, after all, talking about 12-year-olds, who are still well shy of the age of majority and are as vulnerable to sexual exploitation and injury as younger children. *Cf. United States v. Shannon*, 110 F.3d 382, 387–88 (7th Cir. 1997) (en banc) (treating sexual intercourse with 13-year-old as crime of violence), *abrogated on other grounds by Begay v. United States*, 553 U.S. 137, 128 S. Ct. 1581 (2008).

Geasland contends that the government's "close enough" approach to the problem is irreconcilable with the categorical comparison of offenses that *Taylor* and its progeny call for. We appreciate the point that if one is looking for a sufficiently close relationship between the state and federal offenses rather than a 1:1 correspondence of their

elements, the inquiry is significantly altered. Nonetheless, the inquiry is still categorical in the sense that it focuses on the nature of the offenses rather than the details of the defendant's prior crime. Presumably, the "relating to" language of section 2252(b)(2) suggests that the relevant federal offense should be treated as an illustrative example of a particular category of abusive conduct; the question then becomes whether the defendant's prior conviction, as the State defined it, falls into the same category even if not all elements of the state offense match those of the illustrative federal offense. *See, e.g., United States v. Mateen*, 806 F.3d 857, 860–63 (6th Cir. 2015) (holding that court must follow categorical approach which eschews consideration of facts underlying defendant's prior conviction, but concluding in light of section 2252(b)(2)'s "relating to" language that state law proscribing non-consensual touching of another person's erogenous zone for purposes of sexual arousal or gratification constituted law relating to sexual abuse, notwithstanding state cases expansively defining erogenous zones to include arm, shoulder, stomach, mouth and male chest), *cert. denied*, 136 S. Ct. 1688 (2016); *United States v. Barker*, 723 F.3d 315, 320–24 (2d Cir. 2013) (per curiam) (holding that court must follow categorical approach, but concluding in view of section 2252(b)(2)'s "relating to" language that state statutory rape offense may trigger enhancement if the offense by its nature relates to sexual abuse of a minor "as that phrase is ordinarily understood," even if relevant state statute lacks as element a significant age disparity between perpetrator and victim or other aggravating factor found elsewhere in federal law); *United States v. Spence*, 661 F.3d 194, 200 (4th Cir. 2011) (embracing traditional categorical and modified categorical approaches as useful in determining whether defendant's prior state conviction triggered enhanced sentence under section 2252A(b)(2), but reasoning in light of "relating to" language that state offense "does not need to satisfy a narrow definition of sexual abuse in order to qualify as a predicate offense"). As other courts have pointed out, in using the "relating to" language, Congress likely recognized that the various States have defined sexual abuse offenses differently and nonetheless intended for the statutory sentencing enhancement to apply when a defendant's prior state conviction is of the same nature as the offenses it listed as predicates for the enhancement without necessarily matching each element of the federal offense. *See United States v. Allen*, 750 F.3d 209, 213 (2d Cir. 2014).

All of this serves to highlight the magnitude of the burden that Geasland must carry in establishing that his conviction clearly is not one that relates to abusive sexual contact with a minor. Even when the court is following a categorical approach, the breadth of section 2252(b)(2)'s "relating to" language and the room it leaves for state crimes to qualify as predicates without full equivalence with the corresponding federal offense increases the likelihood that any error committed by the district court in deeming Geasland's offense to be such a predicate is not obvious. *Cf. United States v. Thomas*, 835

F.3d 730, 734 (7th Cir. 2016) (unsettled nature of legal question prevents any error from amounting to plain error).[8]

Compounding the problem for Geasland is a second possibility: Even if his state offense does not relate to the offense defined by section 2244(a)(5), it might relate to a generic offense of abusive sexual contact with a minor. We have yet to use generic offenses for purposes of determining whether a defendant is subject to a sentencing enhancement pursuant to section 2252(b)(2) or a like provision. In *Osborne*, for example, we thought it "best" to use the federal statutory offenses as the comparators. 551 F.3d at 721. For its part, the Supreme Court has deemed it "more than a coincidence" that section 2252(b)(2) uses nearly the same terminology—"aggravated sexual abuse, sexual abuse, or abusive sexual contact involving a minor or ward"—that is employed to caption the offenses defined in Chapter 109A. *Lockhart v. United States*, 136 S. Ct. 958, 964 (2016). Yet, the Court has left open the question "[w]hether the terms in § 2252(b)(2) are given their 'generic' meaning or are defined in light of their federal counterparts." 136 S. Ct. at 968 (citations omitted). A number of our sister circuits, however, have referenced generic offenses in deciding whether a defendant's prior state conviction triggers enhanced penalties under section 2252(b)(2); indeed, we are in a minority of circuits that do not do so. *See United States v. Johnson*, 681 F. App'x 735, 741 (11th Cir. 2017) (non-precedential decision) (Martin, J., concurring) (noting that Seventh Circuit is a "notable exception" to majority practice of referencing generic offenses). Yet, we have never definitively ruled out the possibility of looking to generic offenses for purposes of section 2252(b)(2), so it is at least possible that we might look beyond the crimes set forth in Chapter 109A, particularly given that we are currently among a minority of courts that do not do so. *See United States v. Rezin*, 322 F.3d 443, 449 (7th Cir. 2003)

---

[8] We take Geasland's point as to the degree of uncertainty that the statute's "relating to" language introduces into the categorical analysis and the foundation that uncertainty lays for an argument that the statute is unconstitutionally vague. *See Johnson v. United States*, 135 S. Ct. 2551 (2015) (holding residual clause of Armed Career Criminal Act unconstitutionally vague). But we are aware of no court decision holding the language found in section 2252(b)(2) indeed to be unconstitutionally vague, and the mere possibility that such an argument can be made does not demonstrate that it was plainly erroneous to apply the enhancement to Geasland. *See United States v. Caldwell*, 655 F. App'x 730, 733 (11th Cir. 2016) (non-precedential decision) (rejecting as a matter of first impression vagueness challenge to "relating to" language of sections 2252(b)(1) and 2252A(b)(1)); *Holmes v. Grondolsky*, 2017 WL 2435283, at *3 (D. Mass. June 1, 2017) (likewise rejecting vagueness challenge to section 2252A(b)(1)).

(suggesting generic approach "seems more apt" in context of section 2252(b)(2)), *overruled on other grounds by Lockhart*, 136 S. Ct. 958.

The government suggests that it is likely if not inevitable that we would describe a generic federal offense of abusive sexual contact with a minor in such a way as to reach 12-year-old victims. Perhaps so. Certainly other circuits have shown a willingness to do so. *See*, *e.g.*, *United States v. Baron-Medina*, 187 F.3d 1144, 1147 (9th Cir. 1999) (conduct reached by state statute proscribing the touching of the body of a minor 14 years of age or younger with lewd or lascivious intent "indisputably falls within the common, everyday meanings of the words 'sexual' and 'minor'" and thus corresponds to generic offense of sexual abuse of minor for purposes of 8 U.S.C. § 1101(a)(43)(A)).

Geasland rightly retorts that before we can be satisfied that his offense relates to a generic offense involving the sexual abuse of a minor, we must be able to articulate what *each* of the elements of the generic offense is, not just the maximum age of the minor victim, so that the elements of his Wisconsin conviction can be compared with the elements of the generic offense. The government has not attempted to do so, beyond citing a strain of Ninth Circuit precedent in which the court identified three elements comprising the sexual abuse of a minor: conduct that is abusive, sexual, and involves a minor. *See United States v. Farmer*, 627 F.3d 416, 421 (9th Cir. 2010) (citing *United States v. Medina–Villa*, 567 F.3d 507, 513 (9th Cir. 2009)). Whether, in practice, even the Ninth Circuit defines sexual abuse of a minor so broadly is open to question. *See*, *e.g.*, *United States v. Caceres-Olla*, 738 F.3d 1051, 1056 (9th Cir. 2013) (indicating that an age difference of at least four years between the perpetrator and the victim is an element of sexual abuse of a minor). Moreover, it is possible that the generic offense would not be as expansive in the conduct it reaches as section 2244(a)(5) is—it might be limited to contact that is made with an intent to sexually arouse or gratify the perpetrator or to humiliate the victim and exclude touching that is otherwise "abusive."

But this is a not a harmless error case in which it would be the government's burden to nail down all such details; it is a plain error case in which it is Geasland's burden to rule out each possibility under which his offense could be deemed to constitute abusive sexual contact with a minor. *See* Fed. R. Crim. P. 52(b); *e.g.*, *United States v. Vonn*, 535 U.S. 55, 58–59, 62–63, 122 S. Ct. 1043, 1046, 1048 (2002); *United States v. Seifer*, *supra*, 800 F.3d at 329–30. Beyond poking a hole here and there in the government's rationale and articulating reasons why we might not, as a matter of jurisprudential policy, adopt a generic approach to section 2252(b)(2), Geasland has not undertaken a comprehensive analysis demonstrating that sexual abuse of a minor, under any common and reasonable understanding, necessarily would exclude the state offense of which he was convicted. It is not obvious to us that it would.

To end where we began, it is clear in retrospect that there is a mismatch in age between the state sexual assault offense of which Geasland was convicted and section 2244(a)(5). But it is not obvious that despite the mismatch, the state offense could not be deemed one "relating to" the offense set forth in section 2244(a)(5) or, alternatively, to a generic offense involving abusive sexual contact with a minor. Consequently, any error applying the enhanced 10-year minimum term specified by section 2252(b)(2) was not plain.

### III.

Because the police relied in good faith on the issuance of a warrant to search Geasland's apartment, the district court did not err in admitting the results of that search, even assuming that probable cause to support the search was lacking. Nor did the court plainly err in concluding that Geasland's prior conviction in Wisconsin for first degree sexual assault subjected him to a minimum 10-year term of imprisonment pursuant to section 2252(b)(2).

AFFIRMED.